IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ADALBERTO DÍAZ RODRÍGUEZ, et al,

Plaintiffs,

v.

JOSE FIGUEROA SANCHA, et al.,

Defendants.

CIVIL NO. 12-1243 (PAD)

## REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiffs Adalberto Díaz Rodríguez and Olga Díaz Rodríguez ("hereinafter Plaintiffs"[1]), brought this action against several Defendants, all members of the Puerto Rico Police Department ("PRPD") force, for violations to their rights.   Plaintiffs aver that, on the night of May 13, 2011, Defendants intentionally engaged in excessive use of force, unlawful search and seizure of property, failure to intervene to protect the infringement of a citizen's constitutional rights, illegal detention, and inadequate recruitment, training and supervision, all in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the Commonwealth of Puerto Rico.   Plaintiffs challenge these actions, allege they caused them harm, and seek compensatory and punitive damages, pursuant to 42 U.S.C. § 1983, and attorney fees pursuant to 42 U.S.C. § 1988.

Defendants in the instant case are Bill Fernández Aponte ("Fernández"), a member of the PRPD Stolen Vehicles Division; Sergeant Osvaldo Morales Santiago ("Morales"),

---

[1] While the Court will refer to them collectively as Plaintiffs, when discussing particular facts of the case that only apply to Plaintiff Adalberto Díaz or Olga Díaz Rodríguez, the Court will so specify.

Fernández's direct supervisor; Juan Carlos Díaz-Lebrón ("Díaz-Lebrón"), an officer from the PRPD Transit Division; José Figueroa-Sancha ("Figueroa-Sancha"), former Superintendent of the PRPD; Leovigildo Vázquez-Bonilla ("Vázquez"), former Auxiliary Superintendent for Field Operations of the PRPD; and Lieutenant Coronel Carlos J. Colón Alsina, ("Colón"), Director or "Comandante" of the Humacao region.

Before the Court now is Defendants Díaz-Lebrón, Figueroa-Sancha, Vázquez and Colón's Motion for Summary Judgment (Docket No. 134); Plaintiffs' opposition thereto (Docket No. 155); and Defendants' reply to Plaintiffs' opposition (Docket No. 174). At this time, co-defendants Fernández and Morales are in default for failing to answer the Second Amended Complaint. See Docket No. 119. Therefore, the arguments in favor of dismissal only apply to co-Defendants Díaz-Lebrón, Figueroa-Sancha, Vázquez and Colón, hereinafter collectively for the sake of clarity, "Defendants".

Defendants petition the Court to grant summary disposition of all of Plaintiffs' claims, alleging lack of personal involvement. They also deny supervisory liability, insofar as there was "no notice" to them of the constitutional violations and no *respondeat superior* liability. They also raise the qualified immunity defense, arguing the law "is not clear" in this jurisdiction as to supervisory liability. Regarding co-Defendant Díaz-Lebrón, they posit that his sole act was administering a breathalyzer test to Plaintiff Díaz and that no constitutional violation can arise from that.

Plaintiffs counter arguing that summary disposition is unwarranted, as there are issues of material fact in controversy that prevent summary disposition of these claims, particularly, whether the supervisory Defendants engaged in acts or omissions which

caused Plaintiffs' civil rights violations as alleged.   The violations were caused by the inaction of the supervisory Defendants, which Plaintiffs contend allege amounted to a condonation, acquiescence or gross negligence raising to deliberate indifference, as they were aware of the pattern of civil rights violations by the PRPD for years and did nothing about it.   These violations, in turn, were further evidenced by the findings of the United States Department of Justice study and the report of the Independent Monitor of the PRPD. Moreover, Plaintiffs posit that Defendants' qualified immunity argument is unavailing, insofar as the law on to supervisory liability under § 1983 is clearly established by the Court of Appeals for the First Circuit.   As to Díaz-Lebrón, Plaintiffs argue that their evidence purports a cognizable § 1983 for failure to intervene, as he did nothing to protect Plaintiff Díaz' rights after the alcohol breath test yielded negative.

For the reasons explained herein below, it is recommended that Defendants' Motion for Summary Judgment be DENIED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56 (c).   Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law."   Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting

party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The Court of Appeals for the First Circuit has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); *see also*, Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is - and what is not-genuinely controverted.' " Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of

facts." Loc. Rule 56 (c).    If they so wish, they may submit a separate statement of facts which they believe are in controversy.   Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir.   2010) and Colón, 869 F.Supp.2d at 226. Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."   Hernández, 486 F.3d at 7.[2]

### FINDINGS OF FACT

Pursuant to the parties' submissions, the Court deems the following facts uncontested.   Because of the voluminous amount of facts supplied by both parties, the Court only utilized those facts necessary in its analysis of the claims before it.

1. On May 13, 2011, Plaintiff Díaz arrived at the intersection of Roads 921 and 918, got out of his car, and walked towards a liquor store called Cutis Place. D. Exhibit 7, p. 30, lines 17-24.

2. As soon as Plaintiff Díaz got out of his car, a PRPD vehicle arrived and blocked his way. An unknown policeman, without identification or uniform, asked Díaz who he was, what he was doing there and who he was with. D. Exhibit 7, p. 31, lines 2-9.

3. There were two officers in this patrol car and several patrol cars arrived

---

[2] The Court must mention that both parties' habit of merely copying and pasting arguments that merely repeat an objection over and over, with little or no substance to the objection, and which oftentimes have no bearing on the fact itself, is a waste of the Court's time. In addition, although the Court normally does not accept transcripts of deposition testimony supplied by the parties that do not pertain to the particular case before it, the parties seem to have reached an agreement in this case, as Defendants accepted many of Plaintiffs' proposed facts based on deposition testimony from other cases.

shortly thereafter.    D. Exhibit 7, p. 32, lines 9-14.

4.  Díaz opened the truck's door and showed the unknown policeman that the pickup truck was empty. D. Exhibit No. 7, p. 31, lines 12-16.

5.  Other persons continued to interrogate Plaintiff Díaz and stated they would have to search his vehicle, which he did not allow. D. Exhibit 7, p. 32, lines 17-18.

6.  An officer asked Plaintiff Díaz to give him his driver's license and registration.   D. Exhibit No. 7, p. 31, lines 21-23.

7.  The officers were hostile towards Plaintiff Díaz. D. Exhibit 7, p. 32, lines 15-19.

8.  Because Plaintiff Díaz did not permit the officers to search his vehicle, the officers became increasingly hostile and he was hit on the right side of his face and on the back of the head.    D. Exhibit No. 7, p. 33, lines 8-13.

9.  Plaintiff Díaz was unable to see who struck him. D. Exhibit No. 7, p. 33, lines 8-22, and p. 45, lines 2-7.

10.  The officers wrestled with Plaintiff Díaz.   They placed pressure on Díaz' neck and pushed his face on the pavement. While physically assaulting Plaintiff, the officers placed a choke hold on him until he found himself unable to breathe and losing consciousness, and Díaz then opened his hands and released his keys and phone.   The officers then opened the door to the pick-up truck and found a bag of marijuana. D. Exhibit No. 7, p. 34, lines

10-25, p. 35, lines 1-8; P. Ex. A, pp. 34-35, lines 18-25, 1.

11. During the time of Plaintiff's arrest, which took some twenty to thirty minutes, he was stepped on and struck by the police officers.   P. Ex. A., p. 35-36, lines 16-25, 1-2.

12. Plaintiff Díaz was then asked his name, and was then told "I know who he is, I know him, let's go to his home."   D. Exhibit No. 7, 35, l. 10-11; p. 36, lines 5-6.

13. At approximately 11:25 p.m., officers Fernández and Morales brought Plaintiff Díaz to the Traffic Division so that co-Defendant Díaz-Lebrón could perform an alcohol breathalyzer test.   D. Exhibit No. 1, p. 4, ¶ 17.

14. Díaz-Lebrón waited the required twenty minutes before performing the test.   D. Exhibit No. 1, p. 4, ¶ 22.   The test yielded a negative result, showing 0.00% alcohol.   Id. at ¶ 31.

15. After the 0.00% result of the breathalyzer, Plaintiff Díaz asked to be released.   The request was denied and Plaintiff Díaz was instead taken to the hospital.   P. Exhibit A, p. 38, lines 7-11.

16. Plaintiff Díaz was in the hospital for approximately five minutes while his wounds were cleaned and bandaged.   P. Exhibit A, p. 38, lines 15-19.

17. Plaintiff Díaz was not allowed to go or to make a telephone call to his home. Plaintiff was instead transported to the Humacao Narcotics Division, where he was given a citation and released at 2:00 a.m.   P. Exhibit A. p. 39, lines

15-17.

18. During the time that Plaintiff Díaz' incident occurred, Plaintiff Olga Díaz-Rodríguez was sleeping in her home when she heard knocks on her window, and the police identified themselves.   D. Exhibit No. 7, p. 74, lines 24-25, p. 75, line 1, p. 75, lines 2-6.

19. The police forced open her window and entered her home.   Olga Díaz-Rodríguez then opened the door and attempted to telephone her parents but was not allowed to.   She was asked if she was trying to call the person with the red pickup.   P. Exhibit A, pp. 75-76, lines 3-14, 4-19.

20. Olga Díaz-Rodríguez was informed that Díaz was detained for driving under the influence of alcohol, that they identified drugs and that he had allegedly indicated that there were drugs and firearms in the home.   P. Exhibit A, pp. 76-77, lines 6-11, 21-25, 1-2.

21. Olga Díaz-Rodríguez asked if they had a search warrant and she was only given the aforementioned explanation. She again attempted to telephone her parents and had the phone snatched from her hands.   P. Exhibit A, p. 77, lines 13-20.

22. Then, Olga Díaz-Rodríguez asked if she could put shoes and a bra on, and was told she should prepare herself since a canine unit was on the way to the house.   P. Exhibit A, p. 77, lines 21-25.

23. The police officers were in the home for fifteen to twenty minutes.   P. Exhibit A, pg. 78, line 22.   Olga Díaz-Rodríguez was told Plaintiff Díaz was on the scene, but he was not.   P. Exhibit A, p. 79, lines 9-19.

24. Sgt. Morales was the officer on scene.   P. Exhibit A, p. 80, line 16.

25. The police intervention was witnessed by Olga Díaz-Rodríguez' uncle and aunt, namely, Olga Torres and Luis Díaz.   P. Exhibit A, p. 81, lines 20-24.

26. Olga Díaz-Rodríguez felt completely invaded as she was awakened and was never able to get her bearings, given the abrupt nature of the police intervention. She felt like this despite her compliance with all of the instructions given to her, and was nervous and afraid.   P. Exhibit A, p. 84, lines. 15-20.

27. When Olga Díaz-Rodríguez finally saw her husband, he was injured in different parts of his body.   P. Exhibit A, p. 84, line 19; P. Exhibit M.

28. Co-Defendant Díaz-Lebrón began working at the PRPD in July 16, 1998 as a Cadet and, today, he is a Sergeant. D. Exhibit No. 1, p. 1, ¶ 2, 5.

29. In 2005, Díaz-Lebrón was transferred to the Humacao Transit Division. He dealt with Vehicle and Traffic Law of 2000 and among others, was trained in the use of the photometer, radar, and the different breath alcohol detection machines.   He has administered hundreds of tests.   D. Exhibit No. 1, p. 2, ¶ 10-14.

30. Co-Defendant Figueroa-Sancha served as Superintendent of the PRPD from January 2, 2009 until July 2, 2011.   D. Exhibit No. 2, p. 1, ¶ 4; P. Exhibit D, p. 24, lines 16-20.

31. Among Figueroa-Sancha's duties were those of ensuring that the police force carried out its mandate the correct way, to have the right resources and the best training. P. Ex. D, p. 24, lines, 21-25; p. 25, lines 1-8.

32. Figueroa-Sancha does not know who co-Defendant Morales is, did not know of any disciplinary incidents regarding him, and did not give instructions to any of the officers involved in this incident.   D. Exhibit No. 2, p. 1, ¶ 5, 8, 14.

33. While Figueroa-Sancha was Superintendent, training and continuing education was given to police agents on a regular basis through "local academies" during police agents' service periods, which was a monthly lecture that covered such subject matters, among others, as changes in the law and changes in policy, general orders, special orders or police regulations, civil rights, how to intervene with people, sexual harassment, domestic violence, whether force has to be used and the amount of force to be used.   D. Exhibit No. 2, p. 3, ¶ 26.

34. Co-Defendant Colón served as Area Commander for the Humacao Region from November 10, 2010 until the summer of 2012.   D. Exhibit No. 3, p. 1, ¶ 3.

35. Colón did not directly supervise then Police Sergeant Morales or Agent Fernández.   D. Exhibit No. 3, p. 1, ¶ 6.

36. Colón did not directly supervise the Narcotics Division. He did not participate in the drafting of work plans, nor did he participate in the day to day operations of said Division.   D. Exhibit No. 3, p. 2, ¶ 11.

37. The official work plan for the raids that culminated in Plaintiff Díaz' arrest showed Colón at the head of the chain of command for that police operation. P. Exhibit N, p. 6.

38. The unit within the PRPD in charge of investigating citizen's complaints against police officers was at an Auxiliary Superintendence level and was known as the Auxiliary Superintendence of Professional Responsibility or "SARP" for its Spanish acronym.   D. Exhibit No. 3, p. 2, ¶ 12.

39. Once an investigation was completed by SARP it was referred to the PRPD Legal Affairs Division for an evaluation and recommendation. That recommendation was then sent to the PRPD Superintendent, or to any person in which he has delegated such authority, for a final decision. D. Exhibit No. 3, p. 2, ¶ 15.

40. Other than the March 4, 2011 incident, Colón does not know of, or was made aware, of any problems with interventions with citizens by officer Morales. D. Exhibit No. 3, p. 4, ¶ 34.

41. The March 4, 2011 incident was under investigation and it was not until March 7, 2012 that the Puerto Rico Department of Justice ("PR-DOJ") filed charges against all the officers involved, including Morales and Fernández. D. Exhibit No. 4, p. 2, ¶ 24.

42. The Puerto Rico Court found probable cause against the officers. D. Exhibit No. 4, p. 2, ¶ 25.

43. As a result of the Court's probable cause determination the officers involved, including Morales and Fernández, were suspended from employment and pay immediately.   D. Exhibit No. 4, p. 2, ¶ 26.

44. The case later ended favorably for the officers, including Morales and Fernández.   D. Exhibit No. 4, p. 2, ¶ 27.

45. Between agents Fernández and Morales, they have over thirty administrative complaints filed against them.   P. Exhibit C.

46. The Court takes judicial notice that on March 5, 2009, and again on April 10, 2009, the United States Department of Justice ("USDOJ") sent a letter to co-Defendant Figueroa-Sancha, as Police Superintendent, detailing several concerns that it had with the PRPD's actions and procedures.   P. Exhibits J and K.

47. The Court takes judicial notice that in October, 2010, then Governor Luis Fortuño issued Executive Order 2010-53, creating the Office of the Independent Monitor of the Puerto Rico Police Department, who had the

following duties, among others: monitor, investigate and evaluate all the operation of the PRPD that could have an effect on its ability to protect constitutional and legal rights and prevent, detect and punish illegal conduct by its members; evaluate all policies, protocols, regulations and general orders in areas as recruitment, training, re-training, continuing education, supervision and disciplinary process, investigations of administrative complaints, and use of force.   Among others, the Monitor was also instructed to produce findings and recommendations geared to achieving practices that warrant the protection of civil rights of citizens.   P. Exhibit H, p. 1, first paragraph.   The Monitor issued a number of recommendations.

48.  The Court takes judicial notice that in September, 2011, the USDOJ issued a report that found numerous deficiencies in the PRPD's handling of many issues, including the use of excessive force.   P. Exhibit I.

49.  During the year 2010, the use of force and civil rights mandatory training plan was not yet in place.   P. Exhibit D, p. 58, lines 23-25.

50.  Co-Defendant Figueroa-Sancha agrees with the USDOJ's conclusion that it had reason to believe that the PRPD officers "engaged in a pattern and practice of excessive force in violation of the Fourth Amendment."   D. Exhibit D, p. 101, lines 4- 19.

51. This conclusion was reported by the USDOJ in a document dated September 5, 2011 and included incidents of use of force and civil rights' violations that occurred under Figueroa-Sancha's tenure as Superintendent.   P. Exhibit D, p. 103, lines 7-18.

52. Co-Defendant Figueroa-Sancha admits there were too many vacancies in supervisory positions and that situation contributed to the occurrence of multiple incidents of police misconduct.   P. Exhibit D, p. 108, lines 1-9.

53. Co-Defendant Vázquez was the Auxiliary Superintendent of Field Operations for the PRPD from January, 2009 until July, 2012.   P. Exhibit F, p. 10, lines 23-25; p.11, lines 1-2; D. Exhibit No. 4, p. 1, ¶ 3.

54. As Superintendent of Field Operations, Vázquez supervised the performance of the strategies adopted by public policy, directed at complying with responsibilities of the PRPD.   P. Exhibit F, p. 11, lines 21-24.

55. Vázquez also supervised the preventive and patrol work of the thirteen Police regions of the island.   P. Exhibit F, p. 10, line 25; p. 11, lines 1-2.

56. Each of the thirteen regions had a command officer who reported directly to Vázquez, and that person was in charge of creating the work plan and preventing crime in his respective area and maintaining order and safety. P. Exhibit F, p. 11, lines 9-14.

57.  During Vázquez' assignment as the Auxiliary Superintendent of Field Operations, around 14,500 police officers and civilian employees were under his command.   D. Exhibit No. 4, p. 1, ¶ 5.

58.  Vázquez reported directly to Figueroa-Sancha, then Superintendent of the PRPD. D.   Exhibit No. 4, p. 1, ¶ 10.

59.  Among other things, Vázquez admits that:

  a.  The reason behind the need to improve use of force and civil rights is that training is of the utmost importance in order to prevent Police officers from abusing civil rights and using excessive force.   D. Exhibit F, p. 33, lines 12- 18.

  b.  An untrained officer on use of force and civil rights is more likely to engage in a pattern of violations or in incidents violating civil rights or use of force because of lack of training. D. Exhibit F, p. 39, lines 12-17.

  c.  A duly trained, regularly trained officer in civil rights or use of force is less likely to use excessive force.   D. Exhibit F, p. 39, lines 18-21.

  d.  One of the ways of preventing violations of civil rights and use of force is assuring the police officers have regular training and correct supervision.   D. Exhibit F, p. 40, lines 9-12.

e.  Supervision is of the utmost importance so officers work correctly and perform their work according to the law.   D. Exhibit F, p. 40, lines 13-18.

f.  Internal investigations of police wrongdoing in civil rights and use of force cases can take up to twelve months. D. Exhibit F, p. 41, lines 1-21.

g.  A good disciplinary system and training sessions are necessary in order to adequately supervise the officers.   D. Exhibit F, p.40, lines 19-25.

60. The Auxiliary Superintendent is a position of utmost importance in the PRPD.   In 2004, the PRPD Supervisor specifically attributed oversight of protecting civil rights to that position.   P. Exhibit 4, p. 4.

61. Vázquez, as Auxiliary Superintendent of Field Operations, was at the relevant time empowered with numerous responsibilities, including:

a.  Implementing plans and proposals.   P. Exhibit G; p. 4.

b.  Commanding over regional commanders.   P. Exhibit G; p. 32.

c.  Controlling all PRPD's activities relative to civil rights and the prevention of crimes.   P. Exhibit G; p. 4.

62.  By the time Vázquez began his tenure as Auxiliary Superintendent of Field Operations, Morales and Fernández were already at the Narcotics Division.

Vázquez was unaware of any disciplinary action against either of these officers.   D. Exhibit No. 4, p. 2, ¶ 18.

63. Vázquez was not present at the incident in question, did not supervise Fernández or Morales nor did he give any of the officers involved any instructions on that night.   D. Exhibit No. 4, p. 1, ¶ 4, 8, 11.

64. An investigation by the PR-DOJ's Bureau of Special Investigations, (in Spanish, "Negociado de Investigaciones Especiales" or "NIE") in August, 2014 found, among others, that:

    a. Fernández, despite denying arresting Plaintiff Díaz, was in fact the officer who arrested him and did so without cause.   P. Exhibit P, p. 8.

    b. Sgt. Morales supervised the illegal search of the residence of Olga Díaz-Rodríguez.   P. Exhibit P, pp. 8-9.

    c. The officers had no probable cause to intervene with Plaintiff Díaz or search his car.   P. Exhibit P, p. 8.

    d. Eight administrative complaints regarding search and seizures were a sign of a pattern and practice by Sgt. Morales.   P. Exhibit P, p. 9.

    e. Made a note of Fernandez's spotty administrative record.   P. Exhibit P, p. 9.

    f. The state prosecutor, Thaizza Rodríguez Paga, who was assigned to the Humacao office, determined that no charges be filed against

Plaintiff Díaz given the irregularities committed and noted that a possible violation of civil rights had been committed.   P. Exhibit P, p. 9.

## LEGAL ANALYSIS

Plaintiffs have challenged the Defendants' arguments under two theories.   Since the two main perpetrators, Fernández and Morales, are currently in default, Plaintiffs' arguments against dismissal of the remaining Defendants is that Díaz-Lebrón failed to intervene and did nothing to prevent further injury to Plaintiff Díaz when he saw his medical condition and after he yielded a zero percent alcohol level in the breathalyzer test that he himself administered.   Plaintiffs aver this situation should have alerted him that Plaintiff's arrest was unlawful and he did nothing to help Plaintiff, even after seeing he had been hit by the officers[3].   In relation to Vázquez, Figueroa-Sancha and Colón, as supervisors, Plaintiffs argue that they knew about the atmosphere of excessive force that permeated the PRPD and their inaction encouraged and condoned such behavior by the officers, so as to amount to deliberate indifference.   This deliberate indifference, coupled with lack of training, ultimately gave way to, encouraged and enticed Fernández and Morales' illegal actions against Plaintiffs in the excessive use of force and false arrest

---

[3] There is an issue of fact as to when Plaintiff was hit by the officers.   Plaintiff Díaz contends that it was while he was being detained outside the liquor store, but co-Defendant Díaz-Lebrón claims he did not see Plaintiff injured when he was brought before him for the breathalyzer.   If Díaz-Lebrón's account is to be believed, then Plaintiff was hit by the officers sometime after arriving at the station after the breathalyzer test was performed, since it is uncontested that after the test was finished, Plaintiff was taken to the hospital for medical attention.   Either way, this determination affects the reasonableness of Díaz-Lebrón's actions, and is an issue of fact for the jury to resolve that further prevents summary disposition of this claim.

against Plaintiff Díaz, and in the illegal search of Plaintiffs' property (the pick-up truck and the house).   The Court looks at both arguments in turn.

### A. Supervisory Liability against Figueroa-Sancha, Vázquez and Colón.

For the sake of the dispositive motion, Defendants concede that Plaintiffs did, in fact, suffer civil rights violations in failure to intervene[4] and illegal search and seizure. However, Defendants claim that, since the three supervisory Defendants (Figueroa-Sancha, Vázquez and Colón) were not present at the time the acts took place, they do not know any of the players involved and, since there is no *respondeat superior,* they are not liable.   The Court cannot agree.

To sustain a cause of action based on a theory of supervisory liability, a plaintiff must establish that: "(1) the behavior of [the supervisor's] subordinates results in a constitutional violation and (2) the supervisor's action or inaction was 'affirmatively linked' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence of the supervisor amounting to deliberate indifference.' " Hegarty v. Somerset Cty., 53 F.3d 1367, 1379-80 (1st Cir. 1995) (*quoting* Lipsett v. University of Puerto Rico, 864 F.2d 881, 902-03 (1st Cir. 1988)); see also Gutiérrez-Rodríguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989). Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit

---

[4] This allegation is a bit confusing, as Defendants later present an argument for summary disposition of the claims against co-Defendant Díaz-Lebrón precisely for failure to intervene.   Furthermore, this cause of action has only been raised against Díaz-Lebrón, since Figueroa, Vázquez or Colón were present at the scene at the time the events occurred. The Court will nevertheless analyze the claim.

authorization.   Id. (*citing* Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)).   This necessarily means that a supervisor must have "some kind of notice of the alleged violations." Lipsett, 864 F.2d at 902 (*citing* Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292 (1986)).

Regarding co-Defendants Figueroa-Sancha and Vázquez, Plaintiffs have presented evidence that points to the existence of an atmosphere of possible supervisory encouragement, condonation or acquiescence amounting to deliberate indifference and lack of supervision at the PRPD.   It is uncontested that there was no hands-on training in the use (or prevention) of excessive force and of civil rights by the PRPD.   All the officers had was the "local Academy" which consisted of an informal meeting roughly every month where communications from Police Headquarters were discussed and discussions about the use of force and civil rights were held with the participants.   This was not hands-on training.

Furthermore, at the time the events that gave rise to this complaint took place in 2010, the PRPD was not required to provide regular training on use of force and civil rights to its officers.   That is directly in contrast to today, where the PRPD is under an obligation to provide better training and disciplinary process to officers as a result of a stipulation between the local Department of Justice, the United States Department of Justice and the PPRD.

The findings by the USDOJ further undermines Defendants' defense.   The USDOJ found, among others, that the "PRPD appears to lack basic contemporary practices that

have been adopted by many law enforcement agencies to safeguard the fundamental constitutional rights of the citizens they serve", as well as insufficient guidelines on the application of force, lack of formal requirements for reporting and reviewing use of force, an ineffective disciplinary system, lack of basis processes and resources for internal investigations, inadequate guidance on conducting searches and seizures, inadequate supervision and fragmented community engagement.   P. Exhibit J, pp. 2-4; P. Exhibit K. These findings were all bolstered by the formal report issued by the USDOJ in September, 2011 and by the report of Police Department Monitor Efraín Rivera Pérez. P. Exhibits H and I.

Co-Defendant Vázquez, in charge of ensuring that the officers of the force were duly trained in civil rights and use of force, further admitted under oath that: training is of the utmost importance in order to prevent police officers from abusing civil rights and using excessive use of force; that an officer not trained in use of force and civil rights is more likely to engage in civil rights violations because of that lack of training; that a duly, regularly trained officer is less likely to use excessive force; that one of the ways of preventing violations of civil rights and use of force is assuring that the police officers have regular training and correct supervision, among others.

It is evident that the above elements did not exist in the PRPD while both Figueroa-Sancha and Vázquez were at the agency's helm, and they were both well aware of this situation.  The letters from the USDOJ directed to Figueroa-Sancha dated March and April, 2009 clearly spell this out.  Thus, the fact that co-defendants Vázquez and

Figueroa-Sancha were not at the scene of the incident in question is of little use to them if Plaintiffs can establish that they, as high ranking officers of the PRPD, had knowledge about the constitutional violation atmosphere that permeated the PRPD and did nothing about it.

Compounding this problem is the fact that the officers in question, Fernández and Morales, between them had not less than thirty administrative complaints for illegal search and seizures and for threatening to use firearms against citizens without proper cause, precisely the allegations which were presented in this case.  While Defendants posit that the two officers received additional training at different points in their careers, this amounts to nothing when their administrative complaints are taken together and speak volumes about the woeful inadequacy of whatever, if any, training was offered by the PRPD.

Moreover, an investigation by Defendants themselves found that Fernández lied about having arrested Plaintiff Díaz, that the agents had illegally searched Plaintiffs' house and truck, that Defendants had incurred in "manifest ineptitude" in carrying out the task at hand, negligence in the carrying of their duties, and in misuse or abuse of authority, among others.   D. Exhibit P.   While Defendants have objected to this report (stating it was not given to them until Plaintiffs opposed their summary judgment motion), it is uncontested that the report is the result of an official investigation carried out precisely by the NIE, which is an agency of the Puerto Rico Department of Justice. The fact that Defendants are objecting to this document and alleging they had never seen

it, even though the Puerto Rico Department of Justice is representing Defendants in this case, suggests they did not produce it to Plaintiffs, which is indicative of a flagrant violation of Rule 26 and Rule 11 by Defendants themselves, and not by Plaintiffs as they have argued before the Court.  The document was prepared by the NIE, investigating precisely the events that gave rise to this cause of action. Therefore, Defendants are not in a position to argue they were unaware of the existence of the document.

In addition, Vázquez, as the person in charge of controlling all the PRPD's activities related to the protection of civil rights and crime prevention, and who was in charge of protecting rights was certainly in a position to know about the possible use of excessive force and lack of training in the department where he operated as the number two officer. As part of his duties, he would have certainly also known that most officers did not receive any further hands-on training or refresher courses except some informal monthly meetings.

Furthermore, the fact the Puerto Rico Department of Justice, as well as the Puerto Rico Police Monitor's investigations into precisely these types of actions were happening at the same time Vázquez was in office weighs heavily against Defendants.  And of course, these same arguments apply to Figueroa-Sancha, who, as head of the PRPD, appointed Vázquez to that position, and to whom Vázquez directly reported to. Figueroa-Sancha, as Superintendent, certainly should have known about the multiplicity (more than thirty in total between them) of complaints that had been brought forth against officers Fernández and Morales before the events that gave rise to this cause of action,

since the ultimate resolution of the complaints rested with him.   These inferences, which the Court must make in favor of Plaintiffs, as the non-moving party, preclude summary disposition of these claims.

Finally, regarding Lt. Colonel Colón, there is conflicting evidence as to his involvement in the incident that is the object of the complaint and as to when he acquired knowledge of said incident.   Colón stated in his deposition that he became aware of the incident upon receiving the complaint and had no personal involvement in it, whereas the documentary evidence establishes that he was the supervisory officer, first in line and directly responsible for the police operation which gave rise to this cause of action.   Thus, he must have had contemporaneous knowledge of the police operation and of the incident alleged in the complaint, which as the officer in charge of, he was ultimately responsible for.

As the supervisor responsible for a mobilization of some fifteen officers which included an arrest, the impounding of a vehicle and a massive home search, in certainly gives the Court pause that such a vast operation did not render any accusations and instead only produced the arrest of a man for alleged drunk driving who was in fact, completely sober.   Furthermore, the fact that no search or arrest warrants were issued on the night in question, when they are the norm and not the exception, casts doubt on Defendants' actions and on whatever instructions were given by Colón, the supervisor of the police operation.   It is also telling that Colón was also unaware of the many shortcomings of the officers he commanded, as he was also unaware of the multiplicity of

administrative complaints against Fernández and Morales.   As the Humacao Regional Director, Colón had a duty to ensure that officers under his command were adequately trained and that their actions comported with police standards.   As Plaintiffs correctly point out, when a supervisor fails to monitor the actions of the officers under his charge, an inference can be made that he is acquiescing to their unconstitutional behavior, particularly under the specific facts of this case and given the multiplicity of prior administrative violations by the officers involved.   At this Plaintiff-friendly stage, such an inference can be drawn on the facts presented before the Court.

It is well established that a plaintiff may prove causation of a constitutional violation by "showing a pattern of police violence so striking as to allow an inference of supervisory encouragement, condonation, or even acquiescence, or by showing gross negligence [of the defendant] amounting to deliberate indifference."   Guadalupe-Báez v. Police Officers A-Z, Civil No. 13-1529, 2014 WL 4656663 at *5 (D.P.R. September 17, 2014).   At this stage, Plaintiffs have created a genuine issue of fact that precludes summary disposition of these claims.   It will be up to the jury to resolve these issues.

In view of the foregoing, it is recommended that Defendants' Motion for Summary Judgment as to all Defendants for the supervisory liability claims be DENIED.

### B. Failure to Intervene as to Díaz-Lebrón.

Plaintiffs have also brought forth a failure to intervene claim as to co-Defendant Díaz-Lebrón.   It has been held that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can

be held liable for his nonfeasance.   Torres Rivera v. O'Neill Cancel, 406 F.3d 43 (D.P.R. 2005) (*quoting* Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, (1st Cir. 1990); Byrd v. Brishke, 466 F.2d 6, 10-11 (7th Cir.1972) and Hathaway v. Stone, 687 F.Supp. 708, 711-12 (D. Mass. 1988)).

   In the instant case, co-Defendant Díaz-Lebrón administered a breathalyzer test to Plaintiff Díaz, who had allegedly been arrested for drunk driving, which yielded 0.00% for alcohol.   After the test was performed, there are disputed facts as to the failure of Díaz-Lebrón to act.   Clearly, the facts show that, after the test was administered and yielded negative, it should have been evident that the basis of the arrest was faulty and Plaintiff Díaz had been assaulted.   However, Díaz-Lebrón denied even seeing the beating and further, denied seeing any injuries on Plaintiff.   This clearly is at odds with the evidence, which not only shows injuries to Plaintiff Díaz' face and body, but with the fact that Plaintiff was taken to a hospital after the breathalyzer test was administered in order to receive medical attention.

   Under these circumstances, where the facts surrounding Díaz-Lebrón's actions are unclear and in controversy, and where those actions have direct bearing on whether or not he acted reasonably and legally, dismissal is not appropriate.   It should be the jury who resolves these factual inconsistencies and determines whether or not co-Defendant Díaz-Lebrón has any responsibility.

   Therefore, it is recommended that the Motion for Summary Judgment requesting the dismissal of the claims filed against co-Defendant Díaz-Lebrón be DENIED.

### C. Qualified Immunity.

Defendants also raised a qualified immunity defense but in the most basic and undeveloped way.   As such, it should be DENIED outright.   United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

However, in an abundance of caution, the Court discusses this defense briefly. Defendants raise an "unclarified question of law" argument as to whether individual supervisory liability after Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) was based only on an individual's actions or, conversely, on the individual's actions or omissions.   Their argument is largely undeveloped, and the Court can find no instance of where this alleged "unclarified" and "muddy" question of law has arisen or has actually been addressed. Considering that the case law that Defendants cite for this "unclear" proposition is at least six years old, the Court can hardly say that the law surrounding qualified immunity, a doctrine that is quite often raised in this district, is unclear.

Furthermore, the case that Defendants cite for the "unclear" proposition, Hernández v. Castillo, Civil No. No. 09-1569, 2010 WL 3372527, at *6 (D.P.R. Aug. 24, 2010), stated in no uncertain terms that "Conforming to the Supreme Court's language, the First Circuit has held that '[a]lthough Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*... supervisory officials may be held liable on the basis of their own acts or omissions.'" *quoting* Sánchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir 2009).   This argument is therefore unavailing for Defendants.

Moving on to the analysis itself, as is well known, a two-part test shapes the qualified immunity inquiry.   The Court should deny a defendant qualified immunity if: (1) the facts a plaintiff has either alleged or shown establish a violation of a constitutional right; and (2) the constitutional right at issue was clearly established at the time of the defendant's alleged violation.   Cortés-Reyes v. Salas-Quintana, 608 F.3d 41, 51 (1st Cir. 2010).

Clearly established, in turn, means that the contours of the right are sufficiently clear such that "a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).   That is, "a right is clearly established if, at the time the defendant acted, he was on clear notice that what he was doing was unconstitutional."   Costa-Ureña v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009).   Only if it is determined that the law was clearly established should the court address "the particular conduct in question," Abreu-Guzmán v. Ford, 241 F.3d, 69, 73 (1st Cir. 2001), to decide whether an objectively reasonable official would have believed that his conduct was lawful "in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." McBride v. Taylor, 924 F.2d 386, 389 (1st Cir.1991); see also, Swain v. Spinney, 117 F.3d 1, 9-10 (1st Cir. 1997) (noting that the objective reasonableness inquiry is "highly fact specific").

Determining reasonableness, however, is more problematic, because while the first part of the inquiry deals with abstract legal rules, the final step depends on the facts of a given case.   See Hatch v. Dep't for Children, Youth & their Families, 274 F.3d 12, 24 (1st

Cir. 2001).   The standard is an objective one, that is, whether it was clear to an objectively reasonable official situated similarly to Defendants, that the actions taken (or omitted) contravened the clearly established right.   See Anderson, 483 U.S. at 639, 107 S.Ct. 3034 (emphasizing that the standard is an objective one).

Based on the analysis above, the question would be whether Defendants would have reasonably understood that failure to train the officers in the PRPD could lead to a violation of Plaintiffs' constitutional rights.   While the answer to that question is a possible yes, reasonableness is a question of fact for the jury to analyze.   See BCR Transport Co. v. Fontaine, 727 F.2d 7, 10 (1st Cir. 1984) (qualified immunity is a question of reasonableness and the reasonableness determination was properly left for the jury to resolve); and Kelley v. LaForce, 288 F.3d 1, 6-7 (1st Cir. 2002) (stating that the "objective reasonableness of the offense," although also a question of law, is a matter that must be determined by the jury when there are factual disputes as to material issues of fact).   In such a case, the factual issues must be decided by the trier of fact, thereby precluding summary judgment.

Qualified immunity in the instant case should therefore be denied without prejudice, so Defendants may raise the defense again at the trial, where the Court will resolve the issue of qualified immunity after the return of a verdict.   See Kelley, 288 F.3d at 7 ("Only after the facts have been settled can the court determine whether the actions were objectively reasonable so as to fall under the qualified immunity umbrella").

As such, it is recommended that the petition for summary disposition on qualified

immunity grounds be DENIED WITHOUT PREJUDICE.

### D.    State Law Claims.

Defendants request dismissal of Plaintiffs' state-law claims on the assumption the Court would dismiss the federal claims.   See López Mulero v. Vélez Colón, 490 F.Supp.2d 214, 227 (D.P.R. 2007) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims.").   Since the Court has recommended denial of summary judgment on all federal claims, dismissal of the state claims is therefore not recommended.

### CONCLUSION

For the aforementioned reasons, it is recommended that Defendants' Motion for Summary Judgment (Docket No. 134) be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation.   See Amended Local Rules.   Failure to file same within the specified time waives the right to appeal this order.   See Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986) and Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988).

In San Juan, Puerto Rico, on this 24th day of February, 2016.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE